United States District Court
Southern District of Texas

**ENTERED**

June 29, 2023

Nathan Ochsner, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | |
| SERTA SIMMONS BEDDING, LLC, *et al.*, | On appeal from the U.S. Bankruptcy Court for the Southern District of Texas |
| *Debtors.* | |
| CITADEL EQUITY FUND LTD., LCM APPELLANTS, and EXCLUDED LENDERS, | Bankruptcy No. 23-90020 |
| *Appellants,* | Adv. Proc. No. 23-09001 |
| v. | Appeal No. 4:23-cv-2173 consolidated with 4:23-cv-2292 and 4:23-cv-2296 |
| SERTA SIMMONS BEDDING, LLC, *et al.*, | |
| *Appellees.* | |

### ORDER

These cases all concern the bankruptcy proceedings of Serta Simmons Bedding, LLC and its affiliates ("Serta" or "Debtor"). Before the Court is the appeal filed by Citadel Equity Fund Ltd. ("Citadel") and the appeal of the Excluded Lenders (collectively, "Appellants"), both seeking a ruling to set aside the confirmation of the Debtor's Second Amended Plan of Reorganization. The Bankruptcy Court overruled the objections raised by Appellants and others and adopted the Plan on June 6, 2023 (Bk. 23-90020, Doc. No. 1071). The Plan was to become effective on June 23, 2023, absent any other order from the court. (*Id.*, Doc. No. 1124). Citadel and the Excluded Lenders sought a stay of the Plan's effective date. The Bankruptcy Court held a hearing on that motion on June 21, 2023, and denied the stay. Prior to the Plan becoming effective, Citadel appealed the order of confirmation and sought a stay in this Court (4:23-cv-2173). Shortly thereafter, the Excluded Lenders who also had pre-petition dealings with the Debtor and who

opposed the confirmation of the Plan (in 4:23-cv-2296), also sought a stay in a separate case (4:23-cv-2292). The Excluded Lenders already have an appeal pending in the Fifth Circuit (Case No. 23-20181) concerning a summary judgment entered by the Bankruptcy Court in the Adversary Proceeding (Adv. 23-09001) but have not sought a stay from the Fifth Circuit. The Debtor and a different group of Lenders called the Priority Term Load Lenders ("PTL") oppose a stay and have expressed a desire for the Plan to go into effect as soon as possible.

Thus, in a nutshell, the Court has two different Motions to Stay that ask this Court to take emergency action.[1] In order to effectuate a more orderly process, the Court consolidated the three District Court cases (4:23-cv-2173, 4:23-cv-2292, and 4:23-cv-2296) into 4:23-cv-2173. The Court held a telephone hearing on the two pending motions and temporarily stayed the effective date of the Plan to Thursday, June 29, 2023, at 12:00 noon in order to give these motions due consideration. While many parties have an interest in these matters, the Court will only refer to them individually as they have referred to themselves and collectively as Appellants and Appellees: Citadel and/or Excluded Lenders as Appellants, Serta/Debtor and/or PTL Lenders as Appellees.

## I.     Motions to Stay

While motions to stay are not necessarily an essential feature of all bankruptcy proceedings and appeals, they are not rare and are specifically provided for in the rules. The Bankruptcy Rules require that a motion to stay must be presented to the Bankruptcy Court first. Fed. R. Bankr. R. 8007.

Rule 8007. Stay Pending Appeal; Bonds; Suspension of Proceedings

(a) Initial motion in the Bankruptcy Court

---

[1] The LCM Lenders have joined in the Excluded Lenders Motion to Stay. (4:23-cv-2173, Doc. No. 51). While this Court normally discourages blanket joinders, given the emergent nature of these motions, the Court finds it appropriate here.

(1) In general

Ordinarily, a party must move first in the bankruptcy court for the following relief:

    (A) a stay of a judgment, order, or decree of the bankruptcy court pending appeal;

    (B) the approval of a bond or other security provided to obtain a stay of judgment;

    (C) an order suspending, modifying, restoring, or granting an injunction while an appeal is pending; or

    (D) the suspension or continuation of proceedings in a case or other relief permitted by subdivision (e).

(2) Time to file

The motion may be made either before or after the notice of appeal is filed.

(b) Motion in the district court, the BAP, or the Court of Appeals on direct appeal

    (1) Request for relief

    A motion for the relief specific in subdivision (a)(1)—or to vacate or modify a bankruptcy court's order granting such relief—may be made in the court where the appeal is pending.[2]

The Appellants here unsuccessfully sought a stay in the Bankruptcy Court and thus have complied with this procedural prerequisite.[3]

A stay during appeal is an "extraordinary remedy" and requires a substantial showing. *Thomas v. Bryant*, 919 F.3d 298, 303 (5th Cir. 2019); *Belcher v. Birmingham Tr. Nat. Bank*, 395 F.2d 685, 686 (5th Cir. 1968). The parties here agree on most of the factors that a court considers when ruling on an appeal from the denial of a motion to stay pending appeal. Those factors are similar to those courts consider when facing a request for injunctive relief. They are: (1) likelihood of success on the merits; (2) irreparable injury should the stay not be granted; (3) absence of

---

[2] The rule also contemplates that only the court in which the appeal is pending should consider the propriety of the grant or denial of a stay by the bankruptcy judge. The Court notes that the Excluded Lenders directly appealed a summary judgment ruling to the Fifth Circuit (*See* Case No. 23-20181) yet seek a stay here. Normally, this would not be appropriate. *See e.g.*, *In re Scotia Dev., LLC*, 2008 WL 2811479 (S.D. Tex. July 21, 2008). Nevertheless, since the actual confirmation order is on appeal in this Court and that is the ruling that the parties seek to stay, the Court finds that their motion does not run afoul of Rule 8007 procedurally—although, as the Court notes later, it does find this approach to present more substantive problems.

[3] The Court notes that the Appellants filed their appeal and motion here before obtaining a ruling from the Bankruptcy Court—a procedure that the Appellees described as an "end run." The Appellants did, however, obtain a hearing, request a stay, and obtain a ruling from the Bankruptcy Court, so this Court finds this skirmish to be moot.

substantial harm to the other parties from granting of the stay; and (4) service to the public interest from granting of the stay. *Vote.Org v. Callanen*, 39 F.4th 297, 302–03 (5th Cir. 2022).

The sole dispute concerning the applicable factors centers around the first factor and the question of whether Appellants have to demonstrate a likelihood of success on the merits or merely present a "substantial case." This Court finds it is the former. The Fifth Circuit has relaxed the requirement of demonstrating a likelihood of success on the merits to one of only having to demonstrate "substantial merit" if the case presents a serious legal question *and* the other three factors are "**heavily tilted** in the movant's favor." *In re First S. Sav. Ass'n*, 820 F.2d 700, 709 n. 10 (5th Cir. 1987) (emphasis in original). This appeal primarily centers around the Bankruptcy Court's interpretation of the evidence concerning an indemnity agreement and the application of 11 U.S.C. § 1123(a)(4)(B) to that evidence. These issues, while certainly of great importance to the parties, do not equate to a serious legal issue. *See e.g.*, *Wildmon v. Berwick Universal Pictures*, 983 F.2d 21, 23 (5th Cir. 1992). Moreover, the other three factors as discussed below are not heavily tilted in Appellants' favor.

The Excluded Lenders add the additional argument that their appeal pending in the Fifth Circuit presents a serious legal question. They contend:

> The Excluded Lenders' appeal of the Summary Judgment Order presents a substantial case on the merits involving a serious legal question that has been decided differently by various trial courts but has yet to be addressed by any appellate court: whether an "up-tier" exchange transaction that violates a credit agreement's *pro rata* sharing requirement constitutes an "open market purchase" that is exempt from *pro rata* sharing under the agreement. In view of the absence of appellate authority on this question, and two trial-level decisions reaching a conclusion different from that of the Bankruptcy Court there is plainly a "substantial case" on appeal.

(4:23-cv-2292, Doc. No. 3 at 4).

4

This argument violates the spirit, if not the actual wording, of Rule 8007. It is asking this Court to gauge the likelihood of success of a legal issue that is in front of the Fifth Circuit. While this Court has found that the Excluded Movants have the ability to move for a stay in this Court, it cannot use the subject matter of the Fifth Circuit appeal (that presumably has a different record before it) as a basis for its motion here. That, at best, is bringing an issue through the back door when the rules specifically prohibit coming through the front door. If the subject matter of their Fifth Circuit appeal merits the issuance of a stay, the Excluded Lenders should file for such a stay in that court.

The Court is called upon to review both factual findings and to a lesser extent conclusions of law made by the Bankruptcy Court. The decision to deny a stay is reviewed on an abuse of discretion standard. *In re Barrier*, 776 F.2d 1298, 1299–1300 (5th Cir. 1983). A bankruptcy court abuses its discretion if it seriously errs in its determination that the moving party has established its case for a stay/injunctive relief. *Id.* Its findings of fact are reviewed on a "clearly erroneous" standard. *In re First South Savings Ass'n*, 820 F.2d 700, 711 (5th Cir. 1987). A finding is clearly erroneous if "although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Id.* (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)). Conclusions of law are reviewed *de novo*. Although no factor is dispositive, the likelihood of success and irreparable injury factors are deemed most critical. *Alliance for Hippocratic Medicine v. FDA*, 2023 WL 2913725, at *4 (5th Cir. 2023). To prevail on either, the movant must make a "strong" not merely "possible" showing. *Id.* (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)).

**A.      Likelihood of Success on Appeal**

As noted above, the parties all agree that the initial factor a court should consider when considering a stay of a Plan confirmation order is, absent a serious legal issue, whether the Appellants/Movants have a likelihood of success on the merits. That is as far as their agreement seems to go. During the hearing, they seemed to disagree on what the burden of proof is and sometimes even on which party has it.

This Court finds the Appellants have the burden and they must make a substantial showing that they will prevail on the merits. *Vote.Org*, 39 F.4th at 302–03. Citadel makes four primary substantive arguments. All of its arguments focus on one aspect of the Plan: the indemnification of the PTL Lenders for the pre-petition claims emanating from a 2020 refinancing transaction. First, Citadel claims that the Plan's indemnity violates the Bankruptcy Code because § 502(e)(1)(B) of the Code prohibits the allowance of a pre-petition indemnity agreement. Secondly, it argues that § 1129(a)(ii) forbids confirmation because the Debtors did not account for the value/liability associated with the indemnity. That being the case, it claims the Plan cannot be "feasible." Third, Citadel contends that it and other similarly situated Lenders that were members of Class 4 were treated differently from the PTL Lenders (who were also in Class 4) because the PTL Lenders were indemnified, and Citadel was not. Citadel argues this is disparate treatment forbidden by § 1123(a)(4). Finally, Citadel claims that the position of the Appellees (and the Bankruptcy Court) that the indemnity was a "settlement" violates the Code because the settlement/indemnity agreement was not found to be fair and equitable and in the best intent of the estate.

The Excluded Lenders echo the complaints raised by Citadel, but add their own additional complaint regarding their claims concerning the 2020 Refinancing Transaction and whether that

transaction was a permissible "open market purchase" under an earlier 2016 Credit Agreement. They obviously take the position that it was not permissible. Their motion in this regard contains two flaws. First, as stated above, this is the very issue that is on appeal to the Fifth Circuit . They chose to appeal this issue on an interlocutory basis. Essentially, the Excluded Lenders ask this Court to opine on the merits of its Fifth Circuit appeal. It is not an appellate issue before this Court and as such should not be a ground to substantiate a stay. Second, if this Court did consider it appropriate to opine on the very issue pending before the Fifth Circuit, the motion presents very little by way of argument or authority as to why they have a likelihood of success on this issue. Their argument is focused on whether this issue amounted to a "substantial case," but little beyond that.[4]

       With those deficiencies in mind, the Court will concentrate on the bankruptcy issues upon which both Appellants maintain they will succeed. It will address the issue of "settlement" and "pass-through" claims together.

       Citadel's first argument concerns whether the indemnity about which it complains is not a settlement and instead is an impermissible "pass-through" of a pre-petition claim. The Debtors and PTL Lenders obviously take the opposite position—that neither movant has demonstrated that they have a likelihood of success on any of their complaints. The PTL Lenders argue that the Settlement that led to the inclusion of the indemnity provisions in the Plan was entered into using the "Debtor's sound business judgment." They contend the evidence indicates that the PTL Lenders would not have supported the Plan without the indemnity and that it was part of an overall settlement that was a valid exercise of business judgment.

---

[4] The Excluded Lender's motion does not give the Court the complete background of the issue, nor does it inform the Court about the parameters of the record in the Fifth Circuit. It is that record, not the one here, that will ultimately be used to resolve that appeal. It has informed the Court that two different New York state courts have denied a motion to dismiss on the claims. Denial of a motion to dismiss, however, does not equate a finding of likelihood of success.

They maintain that the indemnity in the Plan is a new indemnity—not a carry through of the Prepetition Indemnity Claims. In support they cite the Bankruptcy Court ruling that the Prepetition Indemnity is "gone." (4:23-cv-02173, Doc. No. 14-17, May 25 Hearing Transcript 1357:21); *see also* (Bk. 23-90020, Doc. No. 1045, Memorandum and Opinion). Appellees argue:

> And, as the bankruptcy court also recognized, the Non-PTL Lenders conceded that if the Plan Indemnity is a new indemnity, "their argument fails," Memorandum and Opinion at 13, because the new indemnity benefits only holders of allowed FLFO and FLSO claims. Because the new indemnity does not cover holders of prepetition contingent claims, and is not given as consideration on account of any prepetition contingent claims, Citadel's Section 502(e) arguments are wholly irrelevant. *See* 11 U.S.C. § 502(e)(1)(B) (requiring a claim to be contingent for the subsection to apply).

(4:23-cv-2173, Doc. No. 11 at 11).

The Bankruptcy Court found it was not. It found that the prepetition indemnity was a claim that was lost. (Bk. 23-90020, Doc. No. 1045 at 13). Further, the Bankruptcy Court found that the inclusion of the indemnity agreement was essentially a settlement, that the Debtor exercised its business judgment in agreeing to it based upon the record, and that it was in the best interest of the estate.

> The Indemnification Obligations contained in the Plan and the New Term Loan Credit Facility Agreement are essential to the Plan and are necessary to implement the Plan. The Indemnification Obligations represent a valid exercise of the Debtors' business judgment. Accordingly, as has been established based upon the record in these chapter 11 cases, the Supporting Declarations, the evidence presented in connection with the Confirmation Hearing, and for the reasons set forth in the Memorandum Opinion, the indemnification provisions contained in Section 8.5 of the Plan and Section 9.03 of the New Term Loan Credit Facility Agreement (i) were an integral part of the Requisite Consenting Creditors' agreement to support the Plan and their entry into the Restructuring Support Agreement, as reflected in the Restructuring Support Agreement, and are essential to the formulation and implementation of the Plan, (ii) are consistent with and permissible under applicable law, (iii) were given in exchange for good and valuable consideration provided by the PTL Lenders, (iv) are in the best interests of the Debtors, their Estates, holders of Claims and Interests, and all other parties in interest, (v) were negotiated in good faith and at arm's length, (vi) confer substantial benefits on the Debtors' estate and their creditors, (vii) are fair, equitable, and reasonable....

8

(*Id.*, Doc. No. 1071 at 19 ¶ hh). There is testimony in the record that certain entities would not have voted for the Plan but for the indemnity. (*See e.g.*, 4:23-cv-2173, Doc. No. 13-30 at 45–46, 117–118, 145–146). Thus, there is certainly factual support for both findings and the Appellants have not pointed this Court to any evidence that would demonstrate the Bankruptcy Court's findings were clear error.

The Appellants also question the feasibility of the Plan based on the fact that the Debtor, when formulating the Plan, did not calculate a specific figure on the possible value (or loss) attributable to the indemnity. Citadel contends it could eventually cost a billion dollars.[5] The evidence when one considers the record as a whole is not that the indemnity was not considered in the overall feasibility determination. The record only supports the conclusion that no one could peg a value to it. That was true then and it is true now. The value is dependent on the result of one, if not multiple, lawsuits. The Supreme Court has written on similar situations recognizing the impossibility of placing a value on future lawsuits:

> Of course, the lawsuit—like any lawsuit—*might* prove fruitless, but the mere *possibility* of failure does not eliminate the value of the claim or the petitioners' injury in being unable to bring it.

*Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 463–64 (2017).

Similarly, the value/liability of the indemnity that depends on multiple lawsuits is not subject to exactitude. Certainly, the value to the Debtor of providing it is clear as the evidence shows it convinced various entities to support the Plan. The eventual cost—which is, of course, what worries Citadel—at this point is unknown. This does not, however, render the Plan unfeasible.

---

[5] The Court notes that Citadel depends on Mr. Linker's testimony for this proposition. Mr. Linker's response to the question as to whether the possibility of the losses due to the indemnity could be a billion dollars was "I don't know." (4:23-cv-02173, Doc. No. 13-30 at 148).

With regard to feasibility, the PTL Lenders emphasize the testimony presented at trial. As to the indemnity and the possibility of untoward consequences, they maintain that it was not ignored, but instead was considered as other non-quantifiable assets/liabilities were. The uncontroverted testimony was that it was impossible to put a value on the indemnity just as it was not possible to put an exact value on an anticipated tax refund. Moreover, the Debtor put on testimony concerning the viability of the Debtor after confirmation. The testimony at trial from Serta's Chief Financial and Operations Officer, John Linker, established that the Reorganized Debtors would be cash flow positive from 2023–2027 and would be able to make all payments required under the Plan. (4:23-cv-02173, Doc. No. 13-30 at 140–148). Mr. Linker also testified that the assumptions underlying those predictions were reasonable in the Debtors' business judgment. (*See id.* 138–139). The testimony and other declarations by Mr. Linker were found to be credible by the Bankruptcy Court and this Court does not find that belief to be unwarranted.

The last issue is the contention that by including the provision of the indemnity for the PTL Lenders and not others the Plan treats different entities that are claimants within Class 4 differently in violation of 11 U.S.C. § 1123(a)(4). That provision dictates a Plan shall "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."

The Debtor responds that "the same" does not mean identical. (citing *In re Dana Corp.*, 412 B.R. 53, 61 (Bankr. S.D. NY 2008). This statement is somewhat of a truism since reorganization plans almost always contain different results for different parties for different reasons even if classified together. For example, two debtors, one who is owed a billion dollars and one who is owed ten dollars, would not be expected each to receive the exact same amount of consideration from the implemented Plan even if they were categorized similarly. The PTL

Lenders emphasize that all Class 4 claimants are receiving take-back debt and equity with the same percentage of recovery. Those that were not indemnified did not request, want, or need the indemnity.

Here, all parties seem to agree that all Class 4 claimants are receiving the same form of consideration and are being given the same opportunity for recovery. Each has agreed to take back debt and equity in the same percentage recovery in exchange for giving up their claims. The sole difference is that the PTL Lenders are being given the indemnity as part of their bargained for support of the Plan. Citadel has admitted that they do not need indemnity and did not ask for it. Indeed, as noted above, the indemnity could prove worthless—even for the PTL Lenders. That being the case, they are not necessarily complaining that the PTL Lenders received additional compensation. What Appellants are complaining about is the risk that the indemnity provisions bring to the possible success of the Debtor. This risk, however, is borne by all claimants regardless of class or status. While the PTL Lenders could eventually be the beneficiary of the indemnity, even their equity, debt, and stake in the Debtor are at equal risk along with Citadel's should the Plan collapse. It should be emphasized that the PTL Lenders bargained for this provision and agreed to back the Plan in return for this concession. Pre-confirmation negotiations are not unusual as various parties seek to galvanize support for one Plan or another. For instance, a Western District bankruptcy court recounted the following:

> Class I is the secured claim of Western Federal Savings & Loan Association. Immediately prior to the confirmation hearing, Western Federal and the debtor negotiated a workout of their differences, by which the debtor agreed to modify its plan to incorporate a "drop dead" provision in the confirmation order and, in consideration therefor, Western Federal agreed to change its vote from a rejection to an acceptance of the plan.

*In re American Solar King Corp.*, 90 B.R. 808, 826–27 (Bankr. W.D. Tex. 1988) (parentheses omitted).

The record indicates, and the Bankruptcy Court impliedly found, that a similar situation here existed. The PTL Lenders (or at least some of them) would not have supported the Plan without the inclusion of an indemnity. This Court finds that the inclusion of the indemnity, while not unimportant does not equate to disparate treatment. Citadel did not request indemnity because it did not need it. It would not benefit them.

This Court finds this last issue to be the one in which Appellants enjoys the greatest possibility of success, if for no other reason than in all likelihood it is not totally dependent on overturning factual findings and since it involves only a single question of law that will be reviewed *de novo* by the court. This Court, however, does not find that this potential merit equates to a likelihood of success. Consequently, taking all of Appellants' points into consideration, this Court does not find they have shown a likelihood of success. While they may have a possibility of success, this possibility is not enough to fulfill this factor.

**B.      Irreparable Injury**

The Appellants' primary contention with respect to the element of irreparable injury focuses on the chance that, should the Plan be implemented, their appeals will be thwarted by a claim of equitable mootness. This Court has described this concept in at least one prior opinion and repeats the discussion here merely for purposes of background.[6]

Equitable mootness as a concept in bankruptcy law has existed for approximately four decades. Some trace its beginnings back to *In re Roberts Farm, Inc.*, 652 F.2d 793 (9th Cir. 1981). It has "evolved in bankruptcy appeals to constrain appellate review, and potential reversal, of confirming reorganization plans." *In re Pacific Lumber Co.*, 584 F.3d 229, 240 (5th Cir. 2009). Unlike the "traditional" or "constitutional" concept of mootness whereby a ruling of a court is

---

[6] This discussion was drawn from this Court's prior opinion in *In re Walker County Hospital Corporation d/b/a Huntsville Memorial Hospital*, 4:20-cv-911 (S.D. Tex. 2020) (Doc. No. 31).

withheld because it would have little or no effect, in equitable mootness the problem is just the opposite—a court ruling would have too much effect. It is perhaps more accurately described as a doctrine of judicial abstention. It has been implemented in situations where a successful bankruptcy appeal would "knock the props out from under the authorization for every transaction that has taken place, [and] would do nothing other than create an unmanageable situation for the Bankruptcy Court." *In re Roberts*, 652 F.2d at 797. It has been described as pitting the concepts of finality against appellate rights or as one author describes it, "[p]ragmatism v. [p]rinciple."[7] The rationale behind the doctrine has been described as follows:

> That early history and subsequent interpreting case law helped establish its purpose as a prudential doctrine. Since *Robert Farms*, equitable mootness "has evolved in bankruptcy appeals to constrain appellate review, and potential reversal, of order confirming reorganization plans." It has evolved into a "kind of appellate abstention that favors the finality of reorganizations and protects the interrelated multi-party expectations on which they rest. It is constantly trying to "strik[e] the proper balance between the equitable considerations of finality and good faith reliance on a judgment and competing interests that underlie the right of a party to seek review of a bankruptcy order adversely affecting him." Case law suggests that the "paramount policy concern reflected by equitable mootness is the protection of third parties' interest who are not participating in the bankruptcy appeal." However, equitable mootness also furthers the "importance of finality to bankruptcy proceedings. Finality is vital to restoring third parties' confidence in a debtor and allowing it to successfully emerge from bankruptcy. The greater the chance the transaction will be undone, the less money parties may be willing to pay for the debtor's securities or assets—a knock-on effect with the potential to endanger the viability to the debtor's reorganization."[8]

It has been accepted as a concept in virtually every circuit in the United States[9]; yet all the while the very courts that have implemented this concept have cautioned against its widespread use. *See e.g., In re One2One Communications, LLC*, 805 F.3d 428, 438 (3rd Cir. 2015) ("[T]he

---

[7] Christopher W. Frost, *Pragmatism vs. Principle: Bankruptcy Appeals and Equitable Mootness*, 15 N.Y.U. J.L. & Bus. 477 (2019).

[8] K. Lewis and S. Mattingly, *Recounting the History and Purpose of the Doctrine of Equitable Mootness and Exploring Its Evolving Persona*, 2020 Ann. Surv. of Bankr. Law 8.

[9] *Id.*

time has come to reconsider whether [equitable mootness] should exist at all . . . .") (Krause, J., concurring). Somewhat like "he who shall not be named," the Seventh Circuit even strongly discourages the use of the term. *Matter of UNR Industries, Inc.*, 20 F.3d 766, 769 (7th Cir. 1994) ("There is a big difference between the inability to alter the outcome (real mootness) and unwillingness to alter the outcome (equitable mootness) . . . Accordingly, we banish equitable mootness from the (local) lexicon.").

Regardless of whether it is viewed with favor or disfavor, it has not been found to be inapplicable in the Fifth Circuit. In this Circuit, to establish equitable mootness, a debtor must show: 1) the plan of reorganization has not been stayed; 2) the plan has not been substantially consummated; and 3) the relief requested by the Appellant would either affect the rights of parties not before the Court or the success of Plan. *In re Tex. Grand Prairie Hotel Realty, L.L.C.*, 710 F.3d 324, 327 (5th Cir. 2013). It is a concept that is looked at with great scrutiny, especially when it involves appeals concerning the rights of secured creditors. *In re Pacific Lumber Co.*, 584 F.3d at 243. In fact, the Fifth Circuit has written that courts in this area should wield it as a "scalpel rather than an axe." *In re Sneed Shipbuilding, Inc.*, 916 F.3d 405, 409 (5th Cir. 2019). "[E]quity strongly supports appellate review of issues consequential to the integrity and transparency of the Chapter 11 process." *In re Hilal*, 534 F.3d 498, 500 (5th Cir. 2008).

Thus, while the Fifth Circuit (and other courts in this circuit) strongly suggests that the concept be used sparingly—especially in Chapter 11 cases dealing with the rights of secured creditors—the concept remains a concern for appellants in bankruptcy appeals.[10]

---

[10] While the Appellants have offered this Court nothing more than a sincere worry that their appellate claims could be extinguished, it is important to note that the Appellees have made it clear they are not waiving their right to claim mootness. That being the case, it is safe to assume that Appellees are not contending the concept does not exist.

The question at this stage, however, is not whether the doctrine of equitable mootness applies here, but whether the possibility of the application of equitable mootness demonstrates irreparable injury. Many district courts in this circuit have held that it does not.[11] Judge Rodriguez succinctly summarized the primary reason why:

> Consummation of the [sale] would likely moot the appeal, but that cannot alone entitle [Appellant] to a stay [pending appeal] because that would mean that anytime an appeal is mooted, a stay would be required.

*In re Camp Arrowhead*, 2010 WL 363773, *7 (W.D. Tex. Jan. 22, 2010); *see also Yucaipa Corp. Initiatives Fund, ILP v. Piccadilly Restaurants, LLC*, 2014 WL 1871889 (W.D. La. May 6, 2014).

The Appellants paraphrase the Bankruptcy Court as expressing its doubt about the viability of the doctrine of equitable mootness in the Fifth Circuit. This Court is not as sure. Nevertheless, both movants maintain that it has no application here, but they offer no reason why (and certainly no evidence in support) that it might apply in this case. If it does not apply, there can be no harm. The irreparable injury must be more than a theoretical possibility. *Nken v. Holder*, 556 U.S. 418, 434 (2009). It must be likely. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Appellants have not satisfied this standard.

As a fallback, Citadel argues that the indemnity agreement (that is the subject matter of Citadel's appeal) itself causes irreparable injury. This position, however, is contingent at best. It may cause no injury whatsoever. When one considers the concept of irreparable injury in the context of arguing for a court to take the extraordinary action of staying a pending appeal, the stay seeker must make "a strong not merely a possible showing" that irreparable injury will occur. *Alliance for Hippocratic Medicine*, 2023 WL 2913725, at *4. In this situation, for the injury to

---

[11] The Court notes that some bankruptcy courts have taken the opposite approach. *In re Herrera*, 2010 WL 148182, *3 (Bankr. W.D. Tex. Jan. 8, 2010); *In re Westwood Plaza Apartments, Ltd.*, 150 B.R. 163, 169 (Bankr. E.D. Tex. 1993); *In re ATP Oil & Gas* (Bankr. S.D. Tex. June 27, 2013), ECF No. 2139.

come into fruition, the Excluded Lenders must first win their appeal to the Fifth Circuit and then prevail on the claim against the PTL Lenders. Thus, this injury, while possible, is far from immediate.

As such, this Court finds the movants have not demonstrated irreparable injury. A general concern, even if justified, is not by itself sufficient.[12]

## C.    Absence of Substantial Harm to Others

The Appellants claim that a stay will not produce any negative impact on others. Citadel argues in its motion that the Debtors will in fact "*benefit* if Citadel succeeds in eliminating the Plan Indemnity." (4:23-cv-2173, Doc. No. 6 at 24) (emphasis in original).

The argument of the Excluded Lenders on this factor is hardly greater either in length or in substance:

> If the stay is granted, no party will suffer substantial harm. Despite the Debtors' interest in getting a "fresh start," a stay will not meaningfully delay it because, even if the Plan goes effective, they will emerge with the uncertainty of an indemnity in favor of the Favored Lenders hanging over their heads. The Debtors have not quantified how much the indemnity will cost, (May 15, 2023 Afternoon Session (Adv. Pro. Dkt. 273) Tr. 116:3–24), and the Favored Lenders do not know whether or not they will actually invoke it. (*See also* May 17, 2023 Afternoon Session (Adv. Pro. Dkt. 283) Tr. 139:2–140:11; Bankr. Dkt. 1045 at 15.) As counsel for the Favored Lenders stated in closing argument, "the owners of the business in the future [will] have a decision to make if there is a claim: whether or not they put the claim back against the company and impact their equity or they deal with the claim in some other fashion." (May 25, 2023 (Adv. Pro. Dkt. 318) Tr. 86:12–16.) And no party knows when or how the Fifth Circuit will rule on the appeal. All of that will be true with or without a stay.

(4:23-cv-2292, Doc. No. 3 at 13–14).

Neither Appellant has offered this Court any evidence on this point. Both base their arguments on the existence/non-existence of the indemnity, the uncertainty inherent in an

---

[12] *See also, SR Constr. Inc. v. Hall Palm Springs*, 2020 WL 7047173, at *3 (N.D. Tex. Dec. 1, 2020) (collecting cases) (citing *In re Fiesta Inn & Suites, LP*, 2009 WL 5195961, at *3 (Bankr. W.D. Tex. Dec. 21, 2009); *In re Ba-Mak Gaming Int'l, Inc.*, 1996 WL 411610, at *2 (E.D. La. July 22, 1996)).

16

indemnity, and when and if it could be triggered. This issuance or non-issuance of a stay does not resolve the indemnity issue. The Court will resolve that issue when it resolves the merits. Consequently, a stay does not benefit anyone in this regard. The Excluded Lenders add, of course, that they cannot predict when the Fifth Circuit will act on their appeal—which, of course, is an accurate statement—but one that might actually favor the opposing conclusion, since they also cannot predict the outcome.

These arguments are obviously opposed by the PTL Lenders and the Debtor. More importantly, unlike the Appellants, the PTL Lenders and the Debtor have evidence on their side of the ledger. Without objection, they introduced the Declaration of John Linker. Mr. Linker is the Chief Financial and Operations Officer of the Debtor and has been in the business world since he graduated from Duke with a Bachelor of Arts in Economics and a Master's in Business Administration. He averred that a delay in confirmation will injure the Debtor in an amount between $83.9 million and $417 million, depending on the length of the stay. These damages result from a variety of circumstances, including delayed tax refunds, and the failure of the return to normal vendor relationships and terms. There would obviously be delays in paying creditors and the Debtor would be obligated to accrue post-petition interest costs. Mr. Linker declared other estimated costs would include lost sales, increased key employee retention costs, debt service, and letter of credit costs. Finally, Mr. Linker swore intangible harms such as loss of goodwill, loss of vendors and customers, and loss of employees would occur if a stay was granted. (4:23-cv-2173, Doc. No. 13-1, Tab A).

As mentioned, this evidence was introduced without objection and is uncontroverted. That being the case, the record is clear that the Debtor will incur significant damages if the Court grants a stay. Further, the evidence supports the conclusion that other creditors, vendors, employees, and

customers also stand to either incur damages or are likely to abandon the Debtor. The Movants, therefore, fail to prevail on this factor. It clearly cautions against a stay.

### D.      The Interests of the Public

The final factor is whether a stay serves the public interest. Again, Citadel bases its argument on the possible untoward result of the Debtor having to honor the indemnity agreement. "Finally, the public interest lies in the correct application of the relevant legal principles—and elimination of a potentially crippling liability—not in sanctioning an indemnity that violates the Code and exposes the Reorganized Debtors to the possibility of a second Chapter 11." (4:23-cv-2173, Doc. No. 6 at 24). As before, the Excluded Lenders put forth an argument based upon the appeal that is not before this Court:

> In a typical case, where, as here, the parties involved are all private entities, courts hold that the direct impact of a stay on the public interest is likely to be minimal or nonexistent, and thus this factor is often neutral. *See Klobotos Props., LLC v. Thomas*, 2021 WL 2953687, at *5 (E.D. Tex. Mar. 1, 2021) (recognizing that because the case "involves a private transaction, the dispute's impact on the public interest is likely to be minimal"). As discussed in Section A, *supra*, the appeal of the Summary Judgment Order calls upon the Fifth Circuit to interpret, as a matter of first impression, the term "open market purchase." Given how commonly that term is used in credit agreements, the Circuit's decision may have a significant impact upon the $1.3 trillion market for leveraged loans. *See* Bd. of Governors of the Fed. Rsrv. Sys., *Financial Stability Report* 20 (Nov. 2022), https://www.federalreserve.gov/publications/files/financial-stability-report-2221104.pdf. If just a third of the loan agreements in the leveraged loan market feature an "open market purchase" carve-out to *pro rata* sharing provisions, hundreds of billions of dollars in loans will be affected by the outcome of this case. Indeed, were there any doubt about the importance of this case to the credit markets, it would be dispelled by the robust coverage afforded to it by the mainstream financial press. *See, e.g.*, Andrew Scurria, *Serta Simmons Wins Ruling on 'Creditor Violence' Deal*, Wall St. J. (Mar. 28, 2023), https://www.wsj.com/articles/serta-simmons-wins-ruling-on-creditor-violence-deal-965e2aa#; Sujeet Indap & Eric Platt, *Big Debt Investors Dealt Blow in Mattress Maker Bankruptcy Ruling*, Financial Times (Mar. 28, 2023), https://www.ft.com/content/3364f0ab-0073-41a0-ad5b-f13cd02ff524.

(4:23-cv-2292, Doc. No. 3 at 14–15) (footnote omitted).

18

As before, the Court finds these arguments to be problematic. Citadel bases its argument solely upon the contingent and possibly crippling impact that might result from the indemnity provision being triggered. This might be a probative argument to make in a brief concerning the propriety of the inclusion of the provision, but it is totally unpersuasive as to whether the stay is in the best interest of the public. Getting a legal issue correct is not contingent upon a stay. The Excluded Lenders argue in favor of the stay based upon the outcome of their case in the Fifth Circuit. Clearly, that issue is not before this Court, and it is quite questionable whether this Court could or should base a stay in a pending matter here when the motion could and perhaps should have been brought in the Fifth Circuit. It is clear how the Excluded Lenders will benefit from winning their appeal; it is less clear how that benefits the public interest.

The Appellees' briefing concentrates primarily on the harm to the Debtor as was outlined in the Linker Declaration. PTL Lenders maintain that the public interest is always served by a successful reorganization and an expeditious administration of a bankruptcy case. While these latter two sentiments are no doubt true, they apply in all bankruptcy cases regardless of whether a stay is entered or not. In fact, the Court has little doubt that both Appellants would agree that these two goals are worthy (and would, of course, argue that they would be more obtainable if the stay were entered).

While this Court does not find any of these positions overwhelmingly convincing, it finds this factor slightly favors the Debtor because the record certainly does not equate to a substantial showing by the Appellants.

## II.    Conclusion

This Court hereby denies both Motions to Stay. While it does find Appellants' argument concerning disparate treatment intriguing, it does not find that it or any of their other legal

19

contentions demonstrate a likelihood of success on the merits. It also finds that the Appellants have

not shown that they will suffer irreparable injury or that the stay will not injure the other interested

parties. While the Court concedes that the last factor (the best interest of the public) is a virtual

draw, this finding in light of the findings on the other three factors does not carry the day.

The Motions to Stay are **DENIED**.

SIGNED at Houston, Texas this 29 day of June, 2023.

Andrew S. Hanen
United States District Judge

20